[No. 1475.]

### Charles Darnell v. The State.

1. Practice—Assignment of Error—Charge of the Court.—That "the charge is erroneous" is not such an assignment of error in motion for new trial, as will point out to trial judge the error complained of.
2. Murder—Charge of the Court.—It is only when the evidence tends to present a lower degree of culpable homicide than murder in the first degree, that the trial court is required to charge upon such inferior grade of homicide.
3. Same—Evidence.—See the statement of the case for evidence held sufficient to support a conviction for murder in the first degree, with the death penalty.

Appeal from the District Court of Wood. Tried below before the Hon. J. C. Robertson.

The indictment in this case, filed on the twenty-second day of May, 1883, charged the appellant with the murder of William Gilbraith, in Wood county, Texas, on the twelfth day of May, 1883. The result of his trial was his conviction of murder in the first degree, with the death penalty attached.

Polly Gilbraith, the widow of the deceased, was the first witness for the State. She testified that, on the morning of May 12, 1883, the deceased left home, saying that he was going to the "Boss Mills," near Winnsboro, to contract for lumber with which to build a new residence. His mare, with saddle and bridie on, came home that night after dark. The deceased failing to appear, the witness became uneasy, and dispatched her son James to the house of Mr. Bob Nichols, to make inquiries concerning him. Next morning she learned of her husband's death

The defendant had then lived within three or four miles of the house of the witness and the deceased for four or five years. Beyond the fact that she had heard that, for some unknown reason, the defendant had fallen out with the deceased, she had never known of hard feelings between them. She had never heard the deceased speak an unkind word of the defendant. The deceased had no arms—not even a pocket knife—with him when he left home, on the morning of May 12, 1883. He had the

day before lost the only pocket knife he owned, which was found on the day after his death. His only pistol was left in his trunk. The witness and deceased had lived in the neighborhood of the tragedy ever since their marriage, seventeen years before; and had four children.

James Gilbraith, the sixteen year old son of the first witness and the deceased, testified for the State, that on the night of May 12, 1883, the mare of the deceased returned home alone. The bridle, saddle and halter were on her, the bridle and halter being tied up in the usual manner. The saddle had gashes cut across the seat, which gashes were evidently cut by the rowels of a spur.. The saddle had blood on it just in front and just below the pommel or horn, and a bundle of pants goods was tied on behind. At the instance of his mother, the witness went immediately to search for the deceased. He went first to Bob Nichols, a near neighbor, and thence, with Mr. Nichols, to the house of Mr. Clayton, about two and a half miles east, on the Winnsboro and Emory roads, on which road the deceased lived. This road led from the deceased's house to Winnsboro, and passed the house of the defendant. Thence the witness, Nichols and Clayton went on, and, in the ditch in the lane near the defendant's house, they found the body of the deceased. Clayton and Nichols examined the body and said that life was extinct. The witness then went to summon Jo. Byrd and others living in the immediate neighborhood. He soon returned, and the party watched the corpse all night, allowing no one to go down the road, or east of the body—in which direction Winnsboro lay. The body lay on the back, hands up, head east and feet west. It had five bullet holes in it.

William Clayton, for the State, corroborated the narrative of James Gilbraith as to what transpired after the party left the residence of the witness. He testified, in addition, that between sundown and dark on that evening, while he was at the house of Jo. Byrd, some four hundred yards distant from the lane described, he heard five reports of a pistol or gun. Four of these reports followed each other as rapidly as they could well be fired from a pistol, and the fifth followed within a few moments. These reports the witness took to come from the direction of the lane in which the deceased's body was afterwards found. This fact led the witness to go to the lane when he learned that the deceased was missing. One of the deceased's spurs was broken and the rowel was entirely gone.

Jo. Byrd was the next witness for the State. He testified that while he was drawing water at his house on the evening of May 12, 1883, between sundown and dark, he heard four shots in quick succession. He did not hear a fifth. William Clayton was at the witness's house at the time. That night Jim Gilbraith and others came to his house and told him that the deceased was lying dead in the lane. The witness at once went to the body, and gave directions to permit no one to go east of the body that night. The witness left the body about daylight. No one went into the lane east from the body or came from the east to the body while the witness was there that night. There were five bullet holes in the body. One entered under the right shoulder blade to the right of the back bone, and lodged on the left side in front, just below the neck bone; one was in the left breast, one in the right jaw, one on the forehead just above the right eye, which was badly powder-burned, and out of which blood and brains were profusely flowing, and one was in the crown of the head, and ranged down, without penetrating the skull. This last wound was badly powder-burned. Blood and brains had trickled several feet from the head.

The witness examined for tracks next morning, and found those of a man following closely those of a horse from a point near a tree which stood on the road, some twenty-five feet from where the body lay. This track halted within two or three feet of the deceased's head. The horse's tracks seemed to make a sudden whirl near the tree, turning left and going west, and ranging around the left edge of the road to where the body was found. The track of the man came from near the tree spoken of, and followed the horse's track. Neither the man's nor the horse's track could be followed beyond the body westward. The tracks of both man and horse were well preserved, as all the parties who came to the body came from the west. The boots which were fitted into the track next day by the officers, in the presence of the witness, fitted the tracks in every particular. The body was found in the defendant's lane, within two hundred yards of, and in sight of the defendant's house.

Theo. Taylor, the next witness for the State, corroborated the witness Byrd as to the tracks, the location of the tree, and the comparison of the boots to the tracks. These tracks were in the ditch and on the opposite side of the body from the tree, going toward the tree, and from the tree along and behind the trail of the horse, to within two or three feet of the body. The ground

around the tree was hard and overgrown with grass. No track could be found immediately around the tree.

The next witness for the State was J. C. Nichols, one of the coroner's jury. He corroborated Byrd, Taylor and others, as to the tracks, measurements, wounds, etc., describing minutely the route and condition of the tracks, premises and surroundings. He and the other witnesses concur in the statement that the tracks of the horse indicated that the animal suddenly whirled to the left, leaving its route, near the tree. Thence on, the tracks dug the earth, as though the animal was running. The man's track following the horse track was four or five feet from the horse track, and indicated that he, too, was running.

Sheriff Flournoy testified, for the State, that, upon being notified of the killing, he started immediately to the scene, and arrived about sunrise. Thence he went to the defendant's place of residence, a short distance off. The family were up. The defendant and his brother were in the front room, the defendant sitting on his bedside. The defendant's father and Tom Moore were in an adjoining room, in full view of the witness.

The witness said: "Gentlemen, William Gilbraith is dead—has been killed—and is lying out yonder in the lane. Do any of you know anything about it?" The defendant's brother replied that he had not heard of it. The witness then asked the defendant if he knew anything of it, and he replied that he did not. The witness thereupon told him to consider himself under arrest. He made no reply, nor did he then or afterward ask why he was arrested. He went quietly and willingly with the witness to the body.

Before leaving the house the witness asked the defendant for his pistol, which he got from a box. It was fresh loaded and seemed to have been recently fired, as indicated by fresh powder signs. It was a new Smith and Wesson 38-calibre five shooter—the same weapon exhibited in court. The defendant, when arrested, had on a brand new pair of shoes. The witness secured his boots, which he took and turned over to the coroner's jury. These boots were applied to the tracks found near the body, and were found to fit exactly. The witness took one of the cartridges from the pistol, and found it to fit exactly in the hole in the dead man's skull. Moore testified before the coroner's jury. The witness then arrested him, and jailed him and the defendant.

Francis Hensan testified, for the State, substantially as others

did concerning the appearance of the body, surroundings, etc. On the day after the homicide, and continually thereafter, the witness noticed defendant's wagon on his premises, standing under a tree. It had stood since then in the same place. About two weeks after the homicide the witness found in that wagon five empty centre-fire cartridge shells. These shells were found to fit defendant's pistol perfectly.

Deputy sheriff R. L. Terrell, testifying for the State, corroborated the narrative of sheriff Flournoy. In addition, he stated that, during the previous term of the court, the defendant's wife secured a divorce. A writ of attachment against defendant's crop was placed in the hands of the witness at the same term, which the witness levied. He employed the deceased and another man to take care of the crop. The defendant became very angry about this. The deceased objected to acting in the crop matter, giving as an excuse that the defendant did not like him, and he accepted the charge under protest only when the witness summoned and required him to do it. The defendant after that complained to the witness that deceased had swindled him out of a half bale of cotton, and appeared very angry, and said that he would make the deceased ·· bite the dust." Witness examined into and found the complaint of swindling to be without foundation. This was at the witness's house, during the fall of 1882, after the defendant had given bail upon a charge of aggravated assault upon his wife. He then said that the deceased was the cause of all his trouble, and that he would make the deceased " bite the dust for it."

T. J. Moore was the next witness for the State. He testified that he was, at the time of the shooting, a tenant on defendant's place, in Wood county. On the morning of May 12, 1883, he and defendant went to the town of Winnsboro, and remained until about three or four o'clock, when they started home. On the way back the defendant said to witness, ·· Will. Gilbraith is in town." The witness did not see the deceased in town. After stopping a half hour at the house of the witness's brother, a few miles from Winnsboro, the witness and the defendant passed the deceased and others sitting by the road side, near the Harris place, talking to a fruit agent. Witness and deceased spoke, but he did not see or hear the deceased and defendant speak to each other. Witness and defendant drove on leisurely to a point within about a mile of the Darnell lane, when the witness saw the deceased riding along horseback a few hundred yards

behind.   This was about sundown.   Having reached about the
middle part of the lane, defendant sprang from the wagon, on
the right, near a tree which stood to the right of the road, about
two hundred yards distant from the defendant's house.   The
witness drove on without looking back, nor did he look back
until he heard some one speak.   Looking at that time, he saw
the defendant holding deceased's right hand and the deceased
trying to pull away from him.   As he succeeded in breaking
away from the defendant the latter ran his hand, first into his
pants, and then into his coat pocket, and drew a pistol—the
same in evidence—with which he began shooting the deceased.
The witness saw him shoot but one, the first, shot, but heard four
more, a short interval elapsing between the two last shots.   The
deceased's mare ran rapidly by the witness, going toward
deceased's house, before the last shot was fired.   The witness
went hastily to the house of the defendant, where he was joined
by the defendant within a few minutes.

The defendant came up to the house with his pistol in his
hand, and said that he had killed Gilbraith.   The witness was
very much frightened, and at a loss to know what to do.   He
slept none that night, nor did the defendant appear to sleep.
He was up and down all night, drinking water very often, and
otherwise appearing uneasy.   He told the witness that if he had
a horse he would leave.   The witness saw but the first shot, and
could say nothing further about how the killing was done.   Wit-
ness and the deceased had been friends for a long time, and
were friends at the time the latter was killed.   The pistol ex-
hibited was the one that the defendant had in his hands when
he came to the house from the place of the shooting.   The boots
which the sheriff got at the house, and applied to the tracks,
were boots that the defendant wore to town on the day of the
killing.   He, defendant, put on a new pair of shoes the next
morning after the killing.   When the defendant came up to the
house, after he had killed the deceased, he had blood on his
hands, shirt and face.   The witness did not know that the de-
fendant had a pistol about his person on the day of the killing,
until the shooting took place.

Cross-examined, the witness stated that he told no one about
the shooting until he was summoned before the coroner's jury,
when he told all that he knew.   He was then arrested, jailed,
and, the next day, was bailed, and, so far as he knew, had not
been indicted.   The witness denied all knowledge of the matter

to the sheriff, at the defendant's house next day, because he was excited, uneasy and afraid. He knew then that the defendant had killed the deceased, and did not know but that defendant might kill him, the witness. The reason why the witness did not sleep that night was because he was uneasy—afraid that defendant might escape, and he become involved in the matter himself. Some time before the killing, the witness heard the defendant say, referring to the deceased: "If ever it comes up again, blood will be spilt." The witness denied that he ever told Mrs. Susan Murray that the "defendant was all right;" that he "killed Gilbraith in self-defense." He did not tell Mrs. Murray that the deceased rode up behind the wagon and struck the defendant over the head with a slung-shot, and that the defendant sprang from the wagon and defended himself. He had never told her anything that could be tortured into such a meaning. He had never told any one that the deceased shot twice at the defendant. No one from defendant's house went down to the body until summoned before the coroner's inquest. The defendant had blood on or near the upper part of his chin when he got to the house, and apparently a gash or scratch. Witness was too much excited to notice closely. He knew that the defendant's hands were bloody. The witness's fright was occasioned by the apprehension that he might be taken up for being along when the shooting occurred.

Jasper Henderson testified, for the State, that on the day of the killing, he caught up with the deceased while the latter was talking to a fruit tree man, and was with him when the wagon containing the defendant and Moore passed. Some time after the wagon passed, the witness and the deceased started on together, traveled together some distance, and separated about one mile from the Darnell lane. The deceased went on his way towards home, which was in the direction and on the road traveled by the wagon. Witness did not hear the deceased say a word about the defendant. The State closed.

Mrs. Susan Murray testified, for the defendant, that she was the defendant's sister, and lived with him and her father at the Darnell place. On the morning of May 12, 1883, the defendant and Tom Moore went to Winnsboro together, in a wagon, and did not get back until nearly dark. Just before their return, the witness was in the plum orchard, and while there heard the reports of firearms. She returned to the house, and in a short time Moore drove up in the wagon, and the defendant followed

very shortly on foot.    Moore told the witness that night that the defendant had killed deceased, but that, as he had done so in pure self-defense, he was in no danger.    He said to the witness that the deceased came up behind the wagon and struck the defendant very hard with a slung-shot; that the defendant then exclaimed, "O! Lordy," and got out of the wagon, and was shot at twice by the deceased, when, in self-defense, he fired and killed the deceased.    Moore assured the witness that the law would exonerate the defendant, and averred that he was going to tell the truth, the whole truth, and nothing but the truth.    Witness asked Moore: "Why did you let Charley shoot Gilbraith?" and Moore replied: "Why, any man will fight in self-defense."    Moore repeated, substantially, the same statements to the witness next morning.    When the defendant came back to the house that night, he had a large gash, an inch long, cut in his chin, which he said was done by the deceased.    It was bleeding freely.

Cross-examined, the witness stated that, though the killing occurred within two or three hundred yards of defendant's house, no one was despatched to notify the neighbors that night. The witness told the defendant and Moore that night that if the defendant killed the deceased in self-defense, he would not be harmed by the law, and that they ought to notify the neighbors. The defendant said that he had no horse.    The man Moore replied that he did not know what to do—he did not know what was best.    The gash on the defendant's face was on his chin— in his whiskers.    The witness knew this because she cleansed it of blood.    The witness knew nothing of the defendant denying to the officers that he knew the deceased was dead.    The witness's father and other brother were at the house when the defendant came home on the evening of the killing, and were there next morning.    No one of the household went to the corpse until taken there by the officers.    The reason why the witness asked Moore why he permitted the defendant to shoot, was that she had rather he had been killed himself than to have killed any one in self-defense.    The witness had never heard the defendant say a harsh word against the deceased.    The wife of the defendant, who had divorced him, was a cousin of the deceased.    The defendant put on a clean shirt on the morning after the killing.

Sheriff Flournoy testified, in rebuttal, that he noticed a small scratch on the defendant's chin, just below and in the right edge

of the lower lip, and above the thick part of the whiskers. He had no bruise or cut place about him. When witness asked the defendant about the killing he said that he knew nothing about it. Moore also denied all knowledge of it, but testified about it before the coroner.

Deputy sheriff Terrell testified, in rebuttal, that he particularly noticed the small scratch on the defendant's chin or lip. It looked like an old, unscabbed scratch, was very small, and a very little blood was oozing out of it. He had no gash or bruise about him.

The opinion sets out the motion for a new trial, which was overruled.

*L. Z. Wright,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge. Charles Darnell, the appellant, stands convicted of the murder of William Gilbraith, the jury assessing the death penalty. From this conviction he appeals to this court.

The record contains no bill of exceptions, assignment of error, or notice of appeal; nor was the statement of facts filed in the court below in time. However, the Assistant Attorney General, upon proper information, agrees that the notice was given, and that the statement of facts was properly filed, and that the record below will show these facts.

When the cause was regularly reached and called for trial, defendant filed a motion for a continuance, for the want of the testimony of Susan Murray. Upon the trial Susan Murray was introduced and testified for the defendant.

The following were the grounds relied upon for new trial:

"1. The verdict of the jury is not supported by the evidence. 2. The verdict of the jury is contrary to law. 3. The verdict of the jury is contrary to the law and evidence. 4. The charge of the court is erroneous."

There was no charge requested by defendant, nor was there objection made to any charge, or portion of the charge given to the jury by the learned judge below. Simply to say, in the motion for new trial, "that the charge is erroneous," furnishes the trial judge no information as to the particular defect complained of, so that relief, if any error was made, could have been granted below.

It is urged by counsel for defendant, in the argument, that the trial judge erred in not submitting to the jury the law applicable to murder of the second degree. This depends upon the facts of the case. If there was evidence tending to present this degree of homicide, evidently the trial judge should have instructed the jury thereon. Nor would the want of cogency of such evidence relieve the court of this duty. The question, therefore, is, was there such evidence? The record in this case shows, beyond any shadow of doubt, that he who killed William Gilbraith committed murder of the highest and most culpable degree; for this homicide was a most dastardly and cowardly assassination.

There is not a fact in the whole record of facts tending in the slightest degree to present an issue upon murder in the second degree; and the trial judge, in this case, would have erred against the interest of society if he had lowered the standard of justice by submitting to the jury a charge upon this degree of homicide. For, as before stated, this was murder of the first degree, and the learned judge did his duty in firmly holding the jury to the only issue presented by the evidence.

Does the evidence sustain the verdict of the jury, finding that defendant Darnell was guilty of this most heinous crime? If it be possible to prove guilt by circumstances, Darnell killed William Gilbraith. The case is not one of circumstances alone, but was witnessed by T. J. Moore, who gave a clear and consistent account of the homicide. But it may be urged that Moore was an accomplice, and that he told different and conflicting tales about the killing. Concede this, nevertheless his evidence was in perfect accord with the physical facts at the *locus in quo.* But, eliminate Moore's evidence from the case, by the facts and circumstances, Darnell's guilt is almost as clear and patent as demonstration itself.

We are, therefore, of the opinion, first, that the evidence proves a homicide upon express malice; and, second, that Darnell was guilty of this terrible tragedy.

We have given the charge of the court a very careful examination, and have failed to find such error as will require a reversal of the judgment. There are some things therein which should have been omitted, but no injustice to defendant appears in the record by reason thereof. Where the record before us shows that the defendant has been awarded a fair and impartial trial, and the evidence develops his guilt, our duty impels us to

affirm the judgment, be the penalty what it may. In the case at bar, the verdict of the jury, that defendant shall die, is, we think, a righteous and just verdict, brought upon defendant by his own calm, deliberate and malicious act; and the judgment entered therein is hereby affirmed.

*Affirmed.*

Opinion delivered November 14, 1883.